FILED
2014 Aug-05  PM 03:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE  DIVISION

| | | |
|---|---|---|
| COMPANION PROPERTY & CASUALTY INSURANCE COMPANY | ] ] ] | |
| **Plaintiff,** | ] ] | |
| v. | ] ] | **CV-12-BE-03670-M** |
| PRO-TECH METAL, INC., DEWAYNE GURLEY and DONNA GURLEY, Individually, Separately, and Severally, | ] ] ] ] | |
| **Defendants.** | ] ] ] | |

## MEMORANDUM  OPINION

This indemnity contract dispute based on federal diversity jurisdiction comes before the court on the Plaintiff's "Motion for Summary Judgment" (doc. 19) and the Plaintiff's "Motion to Strike Affidavit of DeWayne Gurley" (doc. 24).   The motion for summary judgment has received thorough briefing (*see* docs. 20, 22, and 25), and Defendants filed no response to the motion to strike.  For the reasons stated in this Memorandum Opinion, the court FINDS that the motion to strike is due to be DENIED and that the motion for summary judgment is due to be GRANTED.

## I. MOTION TO STRIKE

This dispute arises from an indemnity agreement connected with bonds that the Plaintiff issued on Defendant's two construction projects at Gadsden State Community College. Defendant does not deny that it owes indemnity payments to Plaintiff but argues that the Plaintiff failed to mitigate the damages by retaining a construction consultant from Mobile, Alabama

instead of retaining a less expensive one closer to the Gadsden job site.

Plaintiff directs the Motion to Strike at paragraphs 16 and 17 of Defendant Dewayne Gurley's affidavit.  The Plaintiff objects to Gurley's statement in paragraph 16 that "Pro-Tech Metals, Inc." contacted construction consultant John Payne of Greyson Construction and obtained a specified price for supervision of the Gadsden State project to completion. The Plaintiff argues that Gurley has not established that he had personal knowledge of the contact with Payne and that he is otherwise competent to testify regarding that contact.

The Plaintiff also objects to Gurley's statement in paragraph 17 of his affidavit that several other qualified construction consultants are available in North Alabama to provide consulting work "at a cost less than what the Plaintiff's bonding company eventually paid in this case." (Doc. 23, at 8).  The Plaintiff argues that Gurley does not provide facts showing that he is competent to make that statement and that the statement is not sheer speculation.

However, Gurley specified that the statements in the affidavit were based on personal knowledge, and he holds the position of President of Pro-Tech with experience in the construction industry.  Accordingly, the court has no reason to doubt that he has personal knowledge of the facts asserted in those paragraphs, that he is competent to make the statements of fact, and that the facts in the affidavit can be presented in a form that would be admissible in evidence at trial. *See* Fed. R. Civ. P. 56(c)(4).

Therefore, the court FINDS that the motion to strike is due to be DENIED as to both paragraphs.  The court will enter an order to that effect.  However, the denial of the motion to strike does not mean that all of the statements in paragraphs 16 and 17 of Gurley's affidavit are material.

2

The court notes that, in Defendants' opposition brief, they do not properly dispute the Plaintiff's Statement of Facts showing payment of various sums in connection with the projects at issue in this case.  This court's Uniform Initial Order (doc. 8 at 9 & attaching App. II), Scheduling Order (doc. 11 at 5), and Order Setting Briefing Schedule on the motion for summary judgment (doc. 21) all require compliance with Appendix II, which sets out the appropriate means of disputing a movant's facts:  by responding "to the moving party's claimed undisputed facts [ ] in *separately numbered paragraphs* that coincide with those of the moving party's claimed undisputed facts.  Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based."  *See* www.alnd.uscourts.gov under the court information for Bowdre.  Here, Defendants' opposition brief's fact section does not attempt to respond to the paragraphs in Plaintiff's Statement of Facts showing the Plaintiff's payments relating to the contracts at issue: paragraphs 23-30.  Therefore, the court FINDS that the the information in those paragraphs is deemed to be admitted, as specified in Appendix II regarding the Opposing Party's Statement of Facts:  "*[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*"

The court further notes that Defendant's Additional Disputed Facts do not properly dispute payment because they do not comply with Appendix II, and, in any event, they are not supported by *evidence* countering Carroll's affidavit testifying to payment.  In addition, the court notes that the indemnity contract provides that "[i]n any claim or suit hereunder, an itemized statement of aforesaid loss and expense, sworn to by an officer or agent of Surety, or the vouchers or other

3

evidences of disbursement by Surety, shall be prima facie evidence of the fact and extent of the liability hereunder of Indemnitors." (Doc. 20-4, at 7-8). Carroll's affidavit represents an itemized statement of loss and expense, sworn to by Companion's agent, and complies with the contract provision.

For all of these reasons, the court FINDS that the Defendants have admitted the Plaintiff's Statement of Facts relating to payments made under the indemnity contract, and the facts stated below will reflect that admission.

## II. FACTS

On November 17, 2009, Defendant Pro-Tech Metal, Inc. entered into two contracts with Gadsden State Community College: a contract for the construction of a new student center in the amount of $689,999.00; and a contract for the renovation of a shop building for $53,000.00.

On the same day as the execution of the contracts, the Plaintiff, Companion Property and Casualty Insurance Company, issued payment and performance bonds for the full amount of the contracts on those projects: bonds numbered 7068 on the student center, and bonds numbered 7069 on the shop building project. All of the bonds name Pro-Tech as the principal, Companion as the surety, and Alabama Public School and College Authority and Gadsden State Community College as the owners.

The performance bonds both include the following relevant language:

4. The Surety's obligation under this Bond becomes effective after the
Contractor fails to satisfy a Notice to Cure and the Owner:
(a) gives the Contractor and the Surety ... a written Notice of Termination
declaring the Contractor to be in default under the Contract and stating that the
Contractor's right to complete the Work, or a designated portion of the Work,
shall terminate seven days after the Contractor's receipt of the notice; and
(b) gives the Surety a written demand that, upon the effective date of the Notice

4

of Termination, the Surety promptly fulfill its obligation under this Bond.

5.  In the presence of the conditions described in Paragraph 4, the Surety shall, at its expense:
(a) On the effective date of the Notice of Termination, take charge of the Work and be responsible for the safety, security, and protection of the Work . . . .

(Doc. 20-4, at 13 & 19).

Previously, on April 21, 2009, all Defendants—Pro-Tech; Dewayne Gurley, its president; and Donna Gurley, Dewayne Gurley's wife—had executed an indemnity agreement in favor of Companion, the surety with Pro-Tech as the Principal.  Dewayne Gurley signed it in his capacity as President of Pro-Tech as well as in his individual capacity, and Donna Gurley signed it in her individual capacity.  No dispute exists that Dewayne Gurley was authorized to sign the agreement as president and bind Pro-Tech.

That indemnity agreement provides in relevant part as follows:

**1.  DEFINITIONS**
The following definitions apply in this Agreement:
*Bond* - Any contractual obligation undertaken by the Surety or Principal as principal, joint venturer or in any other capacity, before or after the date of this Agreement, and any renewal or extension of said obligation.
***

**2.  INDEMNITY**
The Indemnitors agree and bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, to indemnify and save harmless Surety from and against any and all liability, loss, costs, damages or expenses of whatever nature or kind and arising out of or in any way connected with such Bonds, including but not limited to fees of attorneys and other expenses, costs and fees of investigation, adjustment of claims, procuring or attempting to procure the discharge of such bonds and attempting to recover losses or expenses from Indemnitors or third parties, whether the Surety shall have paid or incurred same as aforesaid.

Surety shall have the right in its sole discretion to determine whether any suits or claims shall be paid, compromised, defended, prosecuted or appealed and to pay out such sums as it deems necessary to accomplish any of those purposes and its determination as to whether such suit or claims should be settled or defended shall be binding and

conclusive on Indemnitors ....  In any claim or suit hereunder, an itemized statement of aforesaid loss and expense, sworn to by an officer or agent of Surety, or the vouchers or other evidences of disbursement by Surety, shall be prima facie evidence of the fact and extent of the liability hereunder of Indemnitors.

If the surety has cause to enforce the terms of this indemnity agreement by filing suit against Indemnitors to recover sums due under this Agreement, it is understood by the Principal and Indemnitors that the Surety may recover its further expenses of such litigation, accrued interest and including 25% of such sums as attorney's fees.  Any debt accrued by the surety, on behalf of Principal and Indemnitors will accrue interest of 12% per annum.

**3.  DEFAULT**
This Agreement shall be in Default upon the breach by any Indemnitor of any provision hereof or upon the breach by Principal of the provisions of any Bond or Contract of the application of any Bond, including but not limited to, any of the following events of Default:
A.  Principal breaches, abandons or repudiates any Contract.
B.  Any Obligee under any Bond declares Principal to be in Default.
C.  Principals fails to pay for bond premium, labor or materials when such payment is due.

(Doc. 20-4, at 7-8).

Companion first became aware of Pro-Tech's difficulties on both Gadsden State projects through receipt of two notices to cure from the architect dated April 26, 2010, one for each project.

On May 7, 2010, Gadsden State sent a letter via fax and certified mail to Pro-Tech and Companion, providing official notice of termination of the student center project, declaring that Pro-Tech was in default, and demanding that Companion fulfill its performance bond obligations.  On May 14, 2010, Companion sent a letter to Gadsden State via fax, email, and regular mail, stating that Pro-Tech's termination was wrongful, but that, subject to a reservation of its rights, it intended to fulfill its performance bond obligations by hiring Pro-Tech to finish the project.  From that time through mid-June of 2010, Companion continued to negotiate with

Gadsden State to complete the project using Pro-Tech, and as part of the negotiations, Companion proposed to hire a scheduling expert.  Gadsden State objected to the use of Pro-Tech as the surety's completion contractor unless the surety submitted a complete plan for performance providing daily, on-site project management and supervision as well as project reporting to Gadsden State with supplementation of Pro-Tech's forces as necessary to meet the project deadline.

In light of Gadsden State's concern, Defendants offered the name of  John Payne of Grayson Construction, a construction consultant in Birmingham, Alabama, who had quoted a price to Pro Tech of approximately $30,000.00 to supervise the completion of the project.

On June 22, 2010, Companion hired Robert C. Gentle Construction Consultants located in Mobile, Alabama, to provide daily on-site management and supervision of the job to keep it on schedule.

On July 1, 2010, Companion advised Pro-Tech that addressing Gadsden's State's concern regarding project management was in the interests of both the principal and surety, that Companion intended to ensure the existence of daily on-site management and supervision at the student center project, and that Defendants ultimately would be responsible for those costs. Defendants did not voice any objection to Companion about the surety's planned course of action to complete the project.  Further, although Defendants had offered the name of John Payne as construction consultant, the facts submitted in the parties' briefs do not reflect that Defendants objected while the Gadsden State project was on-going to the selection of Gentle because of Gentle's location and the costs associated with managing out-of-town jobs.  Indeed, those facts do not reflect that,  during the pendency of the project, Defendants communicated to Companion

7

any objection at all to the selection of Gentle and interim bills.

On September 7, 2010, Companion sent Pro-Tech an email advising it that Gentle's total fees on the student center project were approximately $56,000.00 as of that date.  Pro-Tech did not respond.

Meanwhile, on the second project, the Shop Renovation, Gentle Construction Consultants received an email on November 23, 2010 from the project architect advising that substantial completion of the project occurred on July 29, 2010, that the architect had been requesting close-out documents from Pro-Tech since that substantial completion date without response, and that the vendors were anxious to receive final payment; in light of that information, the architect asked Gentle to obtain the close-out documents, including a draft of the final pay request.

On January 4, 2011, Companion notified Pro-Tech via email that the surety had paid $110,630.00 to Gentle in consultant fees and $75,098.00 in completion fees, presumably referring to the student center project.  Companion asked Pro-Tech to provide an interim repayment schedule and corporate and individual financial statements, requesting a response by January 7, 2011.   In the same email, Companion also stated its understanding that Pro-Tech had not completed the shop renovation project, its hope that Pro-Tech would complete it, and its request that Pro-Tech advise Companion about its intentions regarding the shop renovation project. Pro-Tech did not respond to the email.

The next day, January 5, 2011, Companion's counsel sent an email to Defendants asking for all materials necessary to close out both the student center and shop renovation projects.  The attorney acknowledged that "there has been no proclaimed default by the Owner on the Shop Building project," but nevertheless stated that Companion "is continuing to receive demands

from the Owner that the [shop renovation] project be closed out." He noted Defendants' failure to provide close-out documents on both projects after repeated requests, demanded that the Defendants provide specified close-out documents, and warned Defendants of the likelihood that the Owner would declare Pro-Tech in default on the shop renovation project.  (Doc. 20-6, at 9  ¶ 34, & at 62-63 - Ex. BB).

On January 18, 2011, Companion wrote to Defendants via regular mail, certified mail, and email, attaching a list of projected accounts payable totaling $67,270.00, asking them to confirm or deny the validity of those charges, and projecting a loss on both projects at $277,697.00, excluding attorney fees.  In this letter, Companion again requested that Defendants prepare an interim repayment plan.  The Defendants did not respond to the requests in this letter.

After the November 28, 2011 year-end inspection of the student center project, Gadsden State wrote a letter to Companion dated November 29, 2011, claiming that it had incurred $74,577.39 in additional legal/architectural and internal project costs, and demanding that Companion pay those additional costs.

Companion denied its liability for those additional costs, but began negotiations to close out the project.

On February 1, 2012, via email and registered mail, Gadsden State requested a meeting with Companion to attempt to resolve the claim for additional costs and to achieve project close out regarding the student center project.  Gadsden State and Companion scheduled the meeting for February 16, 2012, and Companion notified Pro-Tech of the meeting.  Despite Pro-Tech's attorney's request to reschedule the meeting, and Companion's attempt to reschedule at that request, Gadsden State, its attorney and architect refused to change the date of the meeting.

Accordingly, the meeting occurred on that date with representatives for Companion and Gadsden State, including its attorney and architect, and a settlement was reached among those entities; however, no one appeared at that meeting for Defendants.  The settlement provided that Companion would pay Gadsden State $40,000.00 to close out the student center project, would satisfy Gadsden State's claims for additional fees and expenses, and Gadsden State would release Companion from any liability pursuant to bond 007068.  Consistent with this settlement, Companion paid $40,000.00 to Gadsden State to settle the claim and close out the student center project.

In addition to the $40,000.00 paid to Gadsden State on the student center project, Companion paid a total of $139,016.27 to complete performance of the two Gadsden State projects[1] and satisfy outstanding payment bond claims.  It also paid $159,592.49 to Robert C. Gentle Construction Consultants in connection with the completion of those two projects. Finally, it paid $35,886.00 in attorney's fees and expenses through July 31, 2013 for legal representation in connection with completing the two projects and settling Gadsden State's claims.  After crediting all contract funds received, the net loss to Companion on the projects is $374,373.78.

---

[1] Although Carroll's affidavit indicates that these payments involved both Gadsden State projects, the paperwork attached to the affidavit involving those payments refers to the student center project and/or bond 7068, which was the bond for the student center. The payment of $1,500.00 to Glenn Bentley Flooring could be a payment on the shop renovation project; the paperwork connected to that payment references bond 7068, the bond for the student center, but at least one document regarding the $1,500.00 payment identified the job as shop renovation. Because both projects were located at Gadsden State and bond 7068 was the larger of the two, Companion may have put notations for  bond 7068 on all Gadsden State payments and failed to distinguish the payments made pursuant to bond 7069 for the Gadsden State shop renovation project.

### III.  DISCUSSION

The Complaint in this case contains three Counts: Count I - a claim for common law indemnity based on Companion's payment; Count II - a claim for statutory indemnity brought pursuant to Alabama Code § § 8-3-2 and 8-3-5; and Count III - a claim for contractual indemnity in the amount of $347,051.24, plus interest, costs, and attorney's fees, brought pursuant to the written indemnity agreement between Companion and Defendant.  Companion's Motion for Summary Judgment is directed at the claim for contractual indemnity in Count III with the amount of damages updated through July 31, 2013 so that the amount it claims to be due under the contract is $374,373.78.  The motion does not address the other indemnity claims presented in Counts I and II.

The undisputed facts show that Dewayne Gurley signed, both in his individual capacity and as president of Pro-Tech, and that his wife signed individually an indemnity agreement with Companion.  In this agreement, they promised to indemnify Companion from "any and all liability, loss, damages or expenses of whatever nature or kind and arising out of or in any way connected with such Bonds, including but not limited to fees of attorneys and other expenses, costs and fees ...."  (Doc. 20-4, at 7).  The undisputed facts further show that Gadsden State declared Pro-Tech to be in default on the *student center project*.

As to the *shop renovation project,* the parties have pointed the court to no evidence reflecting that Gadsden State formally declared that project in default.  However, the evidence does reflect that, in November of 2010, Gadsden State requested help from Gentle, Companion's consultant, in closing the shop renovation project as well, communicating to Gentle that the project had reached substantial completion four months before but that Pro-Tech had ignored for

11

four months the architect's requests for close-out documents and that not all vendors had received final payment.  Regardless of whether a formal default *declaration* existed for the shop renovation project, Gadsden State asked for help from Companion as surety on the project because Pro-Tech was not paying vendors, and Companion provided that help.  The court finds that any payments that Companion made under that project pursuant to Gadsden State's request fall within the broad language of the indemnity agreement.

Having determined that Companion's payments under both projects fall within the indemnity agreement, the court must next determine the amount Defendants owe under the indemnity agreement. The task is not arduous; Companion's brief sets out the totals paid on both projects and Defendants admitted those payments, as discussed above.  The Defendants did not effectively dispute the payments made, but merely argued that Companion should have mitigated the loss by hiring a local consultant instead of Gentle,  a consultant with headquarters in Mobile.  However, the indemnity agreement itself contained no provision expressly requiring the mitigation of damages or the use of local companies to reduce costs; rather, the indemnity language requires Defendants to hold Companion harmless from  "any and all ... expenses of whatever nature or kind ... in any way connected with such Bonds."  (Doc. 20-4, at 7-8).   To the extent, if any, that Companion had an arguable extracontractual duty to mitigate costs, the court nevertheless knows of no authority requiring such mitigation under these facts and circumstances.  While the facts reflect that Defendants had previously proposed a consultant who quoted a lower price for supervising the project, the facts do not reflect that Defendants objected to the hiring of Gentle, and Defendants admit that they did not object to Gentle's fees and expenses when Companion sent them interim fee statements and requests for indemnity.  Under

12

these facts, Defendants have not effectively raised a jury issue supporting their argument that Companion had a duty to mitigate damages and failed to do so.

Accordingly, the court FINDS that the amount due to Companion from Defendants under the indemnity agreement as of July 31, 2013 is $374,373.78.

Therefore, the court FINDS that Companion's motion for summary judgment as to the contractual indemnity claims in Count III is due to be GRANTED, and FINDS that SUMMARY JUDGMENT is due to be ENTERED on that claim in the amount of $374,373.78, plus costs and expenses incurred since July 31, 2013, as well as interest at 12% per annum and attorney's fees at 25% of the sum due, as specified in the indemnity agreement.

The court will enter a separate Order consistent with this Memorandum Opinion.

Dated this 5th day of August, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE